## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SHAOXUAN ZHANG, derivatively on behalf of ATERIAN, INC., | |
| Plaintiff, | Case No.: |
| v. | |
| YANIV SARIG, FABRICE HAMAIDE, ARTURO RODRIGUEZ, BARI A. HARLAM, WILLIAM KURTZ, GREG B. PETERSEN, and AMY VON WALTER, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| ATERIAN, INC., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Shaoxuan Zhang ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Aterian, Inc. ("Aterian" or the "Company"), files this Verified Shareholder Derivative Complaint against Defendants Yaniv Sarig ("Sarig"), Fabrice Hamaide ("Hamaide"), Arturo Rodriguez ("Rodriguez"), Bari A. Harlam ("Harlam"), William Kurtz ("Kurtz"), Greg B. Petersen ("Petersen"), and Amy von Walter ("von Walter") (collectively, the "Individual Defendants" and with Aterian, "Defendants") for breaches of their fiduciary duties as directors and/or officers of Aterian, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon

personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Aterian, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by directors and officers of Aterian from December 1, 2020 and May 3, 2021, both dates inclusive (the "Relevant Period").

2.      Aterian, f/k/a Mohawk Group Holdings, Inc., is a Delaware corporation based in New York, New York, that engages in e-commerce by developing, marketing, and selling consumer products. Substantially all of the Company's sales are made through the online marketplace operated by Amazon.com, Inc. ("Amazon").

3.      The Company operates a proprietary software platform called AIMEE (**A**rtificial **I**ntelligence **M**ohawk **e**-Commerce **E**ngine). The Company asserts that AIMEE combines data, artificial intelligence ("AI"), machine learning, and automation algorithms to rapidly identify and automate online sales and marketing of consumer products. AIMEE is connected through application program interfaces ("APIs") to multiple e-commerce platforms, which the Company asserts allows it "to automate the purchase of marketing, automate various parts of our fulfillment and logistics operations and to automate pricing changes on product listings."

4.      As part of the Company's customer acquisition strategy, the Company has engaged

in marketing rebate programs in which the Company offered free or highly discounted products in exchange for reviews (the "Flawed Marketing Practices"). The Flawed Marketing Practices exposed the Company to extreme risk due to the Company's heavy reliance on Amazon and Amazon's policies prohibiting the Flawed Marketing Practices.

5.     Furthermore, throughout the Relevant Period, the Individual Defendants made, or caused the Company to make, materially false and misleading statements concerning Aterian's business, operations, and prospects. Specifically, during the Relevant Period, the Company issued public statements that touted the Company's recent acquisitions of other e-commerce businesses and the capabilities of AIMEE.

6.     However, the Individual Defendants failed to disclose that the AIMEE had limited capabilities and was unable to attract customer interest, and that the Company's recent acquisitions were undertaken to obscure the failure of the Company's core business and artificially inflate its revenues. The Individual Defendants further failed to disclose that the Company had engaged in the Flawed Marketing Practices and that the Company's engagement in the Flawed Marketing Practices posed existential risks to the Company.

7.     The Individual Defendant's misrepresentations had the effect of misleading the investing public and artificially inflating the Company's stock during the Relevant Period, during which time one of the Individual Defendants made a lucrative insider sale of Company stock, netting proceeds of over $690,000.

8.     The truth emerged on May 4, 2021 when *Culper Research* published a report (the "Culper Report") that exposed that AIMEE was not AI; that customers had frequently complained about AIMEE; that Aterian misrepresented AIMEE's capabilities and the nature of the Company's business; and that the Company had used acquisitions to obscure the failure of the Company's core

business.

9.      On this news, the price of the Company's common stock fell from its closing price of $20.66 on May 3, 2021 to close on May 5, 2021 at $15.72, a decline of $4.94, or approximately 24%, over two days.

10.     During the Relevant Period, the Individual Defendants breached their fiduciary duties to the Company by causing it to engage in the Flawed Marketing Practices.

11.     Also during the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) AIMEE is an overhyped product with limited capabilities and customer interest; (2) AIMEE is not based on AI; (3) the Company engaged in the Flawed Marketing Practices, posing an existential risk to the Company's relationship with Amazon; (4) the Company's recent acquisitions were undertaken to obscure the failure of the Company's core business and artificially inflate its revenues; and (5) the Company failed to maintain adequate internal controls. As a result of the foregoing, Aterian's public statements were materially false and misleading at all relevant times.

12.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact, while one of the Individual Defendants sold Company shares at inflated prices.

13.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

14.     In light of the Individual Defendants' misconduct—which has subjected the

Company, its Chief Executive Officer ("CEO"), its former Chief Financial Officer ("CFO"), and its current CFO to two federal securities fraud class action lawsuits pending in the United States District Court for the Southern District of New York (the "Securities Class Actions")[1] and which has further subjected the Company to the need to undertake intake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

15.    The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

16.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of the CEO's, former CFO's, and current CFO's liability in the Consolidated Class Action, of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

17.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because

---

[1] The Securities Class Actions were ordered consolidated on August 10, 2021 (the "Consolidated Class Action"), and a Corrected Amended Class Action Complaint (the "Corrected Amended Complaint") was filed in the Consolidated Class Action on October 14, 2021. *Tate v. Aterian, Inc. et al.*, No. 1:21-cv-04323-VM, Dkt. Nos. 47, 57.

Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 promulgated under the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15. U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Consolidated Class Action based on violations of the Exchange Act.

18.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

19.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

20.    Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered or were made in this District, the Company's principal executive offices are in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

21.    Plaintiff is a current shareholder of Aterian. Plaintiff has continuously held Aterian common stock at all relevant times.

### Nominal Defendant Aterian

22.    Aterian is a Delaware corporation with its principal executive offices at 37 East 18th Street, 7th Floor, New York, New York 10003. Aterian's shares trade on the NASDAQ Capital Market ("NASDAQ") under the ticker symbol "ATER."

### Defendant Sarig

23.    Defendant Sarig has served as director, President, and CEO of the Company since September 2018. He co-founded the Company's predecessor entity, Aterian Group, Inc. (f/k/a

Mohawk Group, Inc.) ("Aterian Opco" f/k/a "Mohawk Opco"), and continues to serve that entity

as director, President, and CEO. According to the Company's Schedule 14A filed with the SEC

on June 29, 2021 (the "June 2021 Proxy Statement"), as of June 25, 2021, Defendant Sarig

beneficially owned 250,894 shares of the Company's common stock. Given that the price per share

of the Company's common stock at the close of trading on June 25, 2021 was $16.30, Defendant

Sarig owned approximately $4,089,572.20 of Aterian stock.

24.     For the fiscal year ended December 31, 2020 (the "2020 Fiscal Year"), Defendant

Sarig received $2,449,967 in compensation from the Company, including $266,252 in salary,

$30,000 in bonus, $2,139,003 in stock awards, and $14,712 in all other compensation. On March

11, 2021, during the period when the Company materially misstated information to the investing

public to keep the stock price inflated, and before the scheme was exposed, Defendant Sarig sold

20,108 shares of Company common stock at the artificially inflated price of $34.35, netting

$690,709.80 in proceeds. His insider sale, made with knowledge of material nonpublic information

before the material misstatements and omissions were exposed, demonstrate his motive in

facilitating and participating in the scheme.

25.     The June 2021 Proxy Statement stated the following about Defendant Sarig:

*Yaniv Sarig* has served as a director and our President and Chief Executive Officer
since September 2018, is a co-founder of Aterian Group, Inc. ("Aterian Opco") and
has served as a director and President and Chief Executive Officer of Aterian Opco
since June 2014. Prior to co-founding Aterian, Mr. Sarig led the Financial Services
Engineering department at Coverity, a leading software startup providing code
quality and security solutions for top financial institutions and hedge funds in New
York including NYSE, Nasdaq, JPMC and Barclays, from April 2012 to April
2014. Before joining Coverity, Mr. Sarig held lead technical roles at Bloomberg
from October 2011 to April 2012 and EPIQ Systems, Inc. (Nasdaq: EPIQ), a legal
process outsourcing company, from February 2006 to October 2011. Prior to
moving to New York City, Mr. Sarig lived in Israel where he held various software
engineering roles at startups from various industries including companies involved
in digital printing solutions and military navigation systems. Mr. Sarig also served
in the IDF Special Forces from November 1995 to November 1998, where he

obtained the rank of Sergeant First Class. Mr. Sarig holds a Bachelor of Science in Computer Science from Touro College, is fluent in English, French, Hebrew and C++. We believe that Mr. Sarig is qualified to serve as a member of our Board based on the perspective and experience he brings as co-founder and President and Chief Executive Officer of Aterian Opco.

### Defendant Hamaide

26.     Defendant Hamaide served as a director and as CFO of the Company from September 2018 until March 8, 2021, when ceased to be an executive officer, resigned from the Board, and was appointed General Manager and Head of Corporate Development, Europe. In addition, he previously served as CFO of Aterian Opco. According to the June 2021 Proxy Statement, as of June 25, 2021, Defendant Hamaide beneficially owned 293,532 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 25, 2021 was $16.30, Defendant Hamaide owned approximately $4,784,571.60 of Aterian stock.

27.     For the 2020 Fiscal Year, Defendant Hamaide received $1,440,305 in compensation from the Company, including $283,125 in salary, $30,000 in bonus, $1,106,671 in stock awards, and $20,509 in all other compensation.

28.     The Company's Schedule 14A filed with the SEC on May 15, 2020 (the "2020 Proxy Statement") stated the following about Defendant Hamaide:

> ***Fabrice Hamaide*** has served as a director and our Chief Financial Officer since September 2018 and has served as Chief Financial Officer of Mohawk Opco since July 2017. Prior to joining Mohawk, Mr. Hamaide held numerous financial, CFO and President roles in various technology and consumer product companies in Europe and in the U.S. such as Piksel, Inc. (TV Everywhere, Over-the-Top ("OTT") SaaS) from July 2012 to March 2017, Atari (video game developer, publisher and distributer) from May 2008 to March 2010, Parrot (drone and Bluetooth consumer electronics) from November 2005 to February 2008 and Logitech (PC / TV peripherals) from February 1996 to April 1997. Mr. Hamaide holds an MBA from Columbia Business School, an MS in Information Systems design from the Sorbonne University and a BS in Applied Mathematics from Jussieu University. A petition of bankruptcy was filed by Piksel, Inc. (f/k/a Kit

Digital Inc.) in April 2013. We believe that Mr. Hamaide is qualified to serve as a member of our Board based on the perspective and experience he brings from serving as a Chief Financial Officer for public companies and serving as a board member for private companies.

**Defendant Rodriguez**

29.     Defendant Rodriguez joined the Company in 2017 and has served as CFO since March 2021. According to the Company's current report filed on Form 8-K with the SEC on March 8, 2021, Defendant Rodriguez's annualized salary is $310,000, and he is eligible to receive an annual cash performance bonus of up to 20% of his base salary for fiscal year 2021.

30.     The June 2021 Proxy Statement stated the following about Defendant Rodriguez:

*Arturo Rodriguez* has served as our Chief Financial Officer since March 2021. Prior to that, he served as our Senior Vice President of Finance since September 2017. Prior to joining the Company, Mr. Rodriguez served as Chief Accounting Officer and Global Controller for Piksel, Inc. from July 2012 to September 2017 and also held the role of Interim Chief Operating Officer in 2017. From 2000 to 2011, Mr. Rodriguez held several financial leadership roles with the Atari Group, most notably Acting Chief Financial Officer of Atari, Inc. (Nasdaq: ATAR) from 2007 to 2008, and Deputy CFO of Atari SA (Euronext: ATA) from 2008 to 2010. Mr. Rodriguez started his career at Arthur Andersen LLP in 1997 and is a CPA in the State of New York (inactive). Mr. Rodriguez holds a Bachelor of Business Administration – Accounting from Hofstra University.

**Defendant Harlam**

31.     Defendant Harlam has served as a Company director since February 2020. She served as a member of the Compensation Committee and the Nominating and Corporate Governance Committee throughout the Relevant Period. According to the June 2021 Proxy Statement, as of June 25, 2021, Defendant Harlam beneficially owned 36,125 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 25, 2021 was $16.30, Defendant Harlam owned approximately $588,838 of Aterian stock.

32.     For the 2020 Fiscal Year, Defendant Harlam received $56,566 in compensation

from the Company, which included, *inter alia*, $33,466 in fees earned or paid in cash.

33.     The June 2021 Proxy Statement stated the following about Defendant Harlam:

> **Bari A. Harlam** has served as a director since February 2020, is a business leader, marketer, educator and author. In February 2020, she co-founded Trouble LLC, a pro-social, experience brand. Ms. Harlam has served on the Board of Directors of Eastern Bank since February 2014, Champion Petfoods LP since April 2020 OneWater Marine Inc. (Nasdaq: ONEW) since May 2020 and Rite Aid (NYSE: RAD) since September 2020, and serves as a member of the Compensation Committee for OneWater Marine Inc., as a member of the Nominating and Governance Committee of Rite Aid and as a member of the Risk, Trust, Innovation and Charitable Foundation Committees of Eastern Bank. From April 2018 to March 2020, she served as EVP, Chief Marketing Officer North America at Hudson's Bay Company (TSX: HBC). Prior to her time at Hudson's Bay Company, she was EVP, Membership, Marketing & Analytics at BJ's Wholesale Club (NYSE: BJ) from July 2012 to December 2016. Before joining BJ's Wholesale Club, she served as Chief Marketing Officer at Swipely, now called Upserve, from August 2011 to July 2012 and prior to that, she served as SVP, Marketing at CVS Health (NYSE: CVS) from 2000 to August 2011. Early in her career, she was a Professor at Columbia University from July 1989 to July 1992 and The University of Rhode Island from July 1992 to July 2000. In addition, she was an Adjunct Professor at The Wharton School at The University of Pennsylvania from January 2015 to May 2018. She received a Bachelor of Science, a Master of Science and a Ph.D. in Marketing from The University of Pennsylvania, The Wharton School. We believe Ms. Harlam is qualified to serve as a member of our Board due to her experience in the consumer packaged goods and retail industries as well as her expertise in marketing.

**Defendant Kurtz**

34.     Defendant Kurtz has served as a Company director since August 2019. He served as Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee and Compensation Committee throughout the Relevant Period. According to the June 2021 Proxy Statement, as of June 25, 2021, Defendant Kurtz beneficially owned 51,863 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 25, 2021 was $16.30, Defendant Kurtz owned approximately $845,366.90 of Aterian stock.

35.     For the 2020 Fiscal Year, Defendant Kurtz received $71,711 in compensation from

the Company, including $46,137 in fees earned or paid in cash, and $25,574 in stock awards.

36.     The June 2021 Proxy Statement stated the following about Defendant Kurtz:

***William Kurtz*** has served as a director since August 2019. Mr. Kurtz is a senior financial and operations executive with over 30 years of experience operating as chief financial officer or chief operating officer at several private and public technology companies on the East Coast and in Silicon Valley. Since 2016, he has served as a member of the board of directors of Verint Systems Inc., a customer experience software SaaS company, and he currently serves as chairman of its Audit Committee and as a member of the Nominating & Governance Committee. Mr. Kurtz has served as the Chief Financial and Commercial Officer for Ripcord, Inc. since January 2021 and as its Chief Commercial Officer since April 2021 and is currently serving as its interim Chief Executive Officer while the company conducts a search for a chief executive officer. He is also a member of the Board of Ripcord Inc. Mr. Kurtz also served as a Strategic Advisor for Bloom Energy Corporation, a manufacturer of on-site power generation platforms, since January 2019 to January 2021 and previously served as its Chief Commercial Officer (from May 2015 to December 2018) and Chief Commercial & Financial Officer (from March 2008 to May 2015). Mr. Kurtz has also held a number of CFO or other senior finance and operations roles at a variety of organizations, including Novellus Systems, Inc. (from September 2005 to February 2008), Engenio Information Technologies, Inc. (from March 2004 to August 2005), 3PARdata, Inc. (from July 2001 to February 2004), Scient Corporation (from August 1998 to June 2001), AT&T Corporation (from July 1983 to July 1998) and Price Waterhouse & Co./Brout & Company (from June 1979 to July 1983). Mr. Kurtz also served as a member of the board of directors and chair of the audit committee of Violin Memory Inc. (from November 2014 to February 2017), PMC-Sierra, Inc. (from April 2003 to January 2016), AuraSound, Inc. (from August 2010 to April 2012), ONStor, Inc. (from January 2008 to July 2009) and Redback Networks Inc. (from October 1999 to January 2007). Mr. Kurtz holds a Bachelor of Science in Commerce from Rider University and a Master of Science in Management Sciences from Stanford University. We believe Mr. Kurtz is qualified to serve as a member of our Board due to his experience in chief financial officer and chief operating officer roles and his experience in private and public technology companies.

**Defendant Petersen**

37.     Defendant Petersen has served as a Company director since June 2019. He served as Chair of the Audit Committee and as a member of the Nominating and Corporate Governance Committee throughout the Relevant Period. According to the June 2021 Proxy Statement, as of June 25, 2021, Defendant Petersen beneficially owned 48,625 shares of the Company's common

stock. Given that the price per share of the Company's common stock at the close of trading on June 25, 2021 was $16.30, Defendant Petersen owned approximately $792,587.50 of Aterian stock.

38.     For the 2020 Fiscal Year, Defendant Petersen received $77,299 in compensation from the Company, including $50,075 in fees earned or paid in cash, and $27,224 in stock awards.

39.     The June 2021 Proxy Statement stated the following about Defendant Petersen:

***Greg B. Petersen*** has served as a director since June 2019. Mr. Petersen currently serves on two other public company boards, PROS Holdings, Inc. and Plus Therapeutics, Inc. Mr. Petersen has previously served on other public company boards and has extensive experience as a Chief Financial Officer and executive at several software companies. Since February 2020, Mr. Petersen has served as a member of the board of directors for Plus Therapeutics, Inc., a clinical-stage pharmaceutical company focused on the discovery, development and delivery of innovative treatments for cancer and rare diseases, and serves as a member of its Audit Committee and Compensation Committee. Since 2007, he has served as a member of the board of directors of PROS Holdings, Inc., a provider of artificial intelligence solutions that powers commerce in the digital economy, and serves as chairman of its Compensation and Leadership Development Committee and as a member of its Audit Committee. Mr. Petersen also served on the board of directors of Diligent Corporation (2013 to 2016), a provider of enterprise governance management solutions, and Piksel, Inc. (2012 to 2017), which designs, builds and manages online video services. He was also an advisory board member at Synthesio (2014 to 2016), a provider of social listening tools. Mr. Petersen served as the chairman of the audit committee at Diligent and Piksel. A petition of bankruptcy was filed by Piksel, Inc. (f/k/a Kit Digital Inc.) in April 2013. Mr. Petersen has served as the president of Brookview Capital Advisors, an operations and investment advisory business, since 2016. From 2014 to 2015, he served as Executive Vice Chairman at Diligent Corporation. Mr. Petersen previously served as Chief Financial Officer of Lombardi Software, Inc., a business process management software provider (which was sold to IBM in 2010), from 2008 to 2010 and Activant Solutions, Inc., a provider of business management solutions to retail and wholesale distribution businesses (which is now part of Epicor Software), from 2001 to 2007. Mr. Petersen previously served in executive roles with Trilogy Software, a provider of enterprise software and business services, from 1999 to 2001 and RailTex, a short-line and regional rail service provider, from 1997 to 1999. Mr. Petersen began his career with American Airlines, Inc., including serving as managing director of corporate development. Mr. Petersen holds a Bachelor of Arts in Economics from Boston College and a Master of Business Administration from the Fuqua School of Business at Duke University. We believe Mr. Petersen is qualified to serve as a member of our Board due to his

business and leadership experience in software companies, merger and acquisition experience and extensive financial planning, accounting, governance, compensation planning and risk management knowledge.

**Defendant von Walter**

40.     Defendant von Walter has served as a Company director since June 2019. She served as Chair of the Compensation Committee and as a member of the Audit Committee throughout the Relevant Period. According to June 2021 Proxy Statement, as of June 25, 2021, Defendant von Walter beneficially owned 34,825 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on June 25, 2021 was $16.30, Defendant von Walter owned approximately $567,647.50 of Aterian stock.

41.     For the 2020 Fiscal Year, Defendant von Walter received $69,236 in compensation in compensation from the Company, including $44,487 in fees earned or paid in cash, and $24,749 in stock awards.

42.     The June 2021 Proxy Statement stated the following about Defendant von Walter:

*Amy von Walter* has served as a director since June 2019. Since August 2018, Ms. von Walter has served in various roles at The Nature's Bounty Co., a privately held, global manufacturer, marketer and online seller in the nutritional market, including Chief Administrative Officer and Global Chief Communications Officer. Ms. von Walter has held a number of senior level leadership roles at a variety of organizations, including Toys "R" Us, Inc. (March 2016 to August 2018), Best Buy Co., Inc. (NYSE: BBY) (September 2012 to March 2016), Medtronic PLC (NYSE: MDT) (October 2011 to September 2012), HealthPartners & Regions Hospital (May 2008 to October 2011), Target Corporation (NYSE: TGT) (December 2006 to May 2008) and the Department of Homeland Security (July 2003 to November 2006). She is an expert in crises and issues, having joined the Department of Homeland Security during its early days following 9/11 and having spent much of her career in this space. Ms. von Walter has deep experience in highly complex scenarios, including turnarounds, proxy battles and restructuring, and has managed reputational threats ranging from cybersecurity and terrorism to labor strife, privacy issues, recalls and employee misconduct. Ms. von Walter holds a Bachelor of Arts in Broadcast Journalism and Public Relations from the University of Minnesota, and later served as an adjunct professor at its School of Journalism in 2016. She previously served as an advisory board member for the USC Annenberg Center for Public Relations as well as several nonprofit boards, including Oakland-based Techbridge Girls and Minnesota-based ACES, a nonprofit dedicated to helping low-income students close the achievement gap. We believe Ms. von Walter is qualified to serve as a member of our Board due to her experience in the consumer packaged goods and retail industries as well as her

expertise in human resources, communications, crisis management and public relations.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

43.     By reason of their positions as officers and directors of Aterian and because of their ability to control the business and corporate affairs of Aterian, the Individual Defendants owed Aterian and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Aterian in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Aterian and its shareholders so as to benefit all shareholders equally.

44.     Each director and officer of the Company owes to Aterian and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

45.     The Individual Defendants, because of their positions of control and authority as directors, and/or officers of Aterian, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

46.     To discharge their duties, the officers and directors of Aterian were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

47.     Each Individual Defendant, by virtue of his or her position as a shareholder, director, and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing

and culpable violation of their obligations as directors and officers of Aterian, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also the officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised a majority of Aterian's Board at all relevant times.

48.     As the senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

49.     To discharge their duties, the officers and directors of Aterian were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Aterian were required to, among other things:

         (a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, New York, and the United States,

and pursuant to Aterian's own Code of Conduct and Ethics (the "Code of Conduct");

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Aterian conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Aterian and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Aterian's operations would comply with all applicable laws and Aterian's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate

disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

50.     Each of the Individual Defendants further owed to Aterian and the shareholders the duty of loyalty requiring that each favor Aterian's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

51.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Aterian and were at all times acting within the course and scope of such agency.

52.     Because of their advisory, executive, managerial, directorial, and controlling positions with Aterian, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

53.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Aterian.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

54.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

55.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal

adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

56.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Aterian was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

57.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his overall contribution to and furtherance of the wrongdoing.

58.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Aterian, and was at all times acting within the course and scope of such agency.

<u>**ATERIAN'S CODE OF CONDUCT AND CORPORATE GOVERNANCE**</u>

***Aterian's Code of Conduct***

59.     The Code of Conduct states that it was adopted to encourage:

- Honest and ethical conduct, including fair dealing and the ethical handling

of actual or apparent conflicts of interest;

- Full, fair, accurate, timely and understandable disclosure;
- Compliance with applicable governmental laws, rules and regulations;
- Prompt internal reporting of any violations of law or the Code;
- Accountability for adherence to the Code, including fair process by which to determine violations;
- Consistent enforcement of the Code, including clear and objective standards for compliance;
- Protection for persons reporting any such questionable behavior;
- The protection of the Company's legitimate business interests, including its assets and corporate opportunities; and
- Confidentiality of information entrusted to directors, officers and employees by the Company and its customers.

60.     Moreover, the Code of Conduct states that "[a]ll directors, officers and employees

(each a '***Covered Party***" and, collectively, the "***Covered Parties***") of the Company are expected to

be familiar with the Code and to adhere to the principles and procedures set forth below."

61.     With regard to conflicts of interest, the Code of Conduct states that "[e]mployees

and directors are required to act in the best interests of the Company and are expected to refrain

from engaging in any activity or having a personal interest that presents a 'conflict of interest,' and

avoid even the appearance of a conflict of interest."

62.     With regard to disclosures, the Code of Conduct provides:

The information in the Company's public communications, including in all reports and documents filed with or submitted to the SEC, must be full, fair, accurate, timely and understandable.

To ensure the Company meets this standard, all Covered Parties (to the extent they are involved in the Company's disclosure process) are required to maintain familiarity with the disclosure requirements, processes and procedures applicable to the Company commensurate with their duties. Covered Parties are prohibited from knowingly misrepresenting, omitting or causing others to misrepresent or omit, material facts about the Company to others, including the Company's independent auditors, governmental regulators and self-regulatory organizations.

63.     With regard to compliance, the Code of Conduct provides:

The Company is obligated to comply with all applicable laws, rules and regulations. It is the personal responsibility of each Covered Party to adhere to the standards

and restrictions imposed by these laws, rules and regulations in the performance of his or her duties for the Company. These include, but are not limited to laws covering: bribery and kickbacks, copyrights, trademarks and trade secrets, information privacy, insider trading, illegal political contributions, antitrust prohibitions, foreign corrupt practices, import and exports, sanctioned countries or persons, offering or receiving gratuities, environmental hazards, employment discrimination or harassment, occupational health and safety, false or misleading financial information or misuse of corporate assets.

64.     With regard to insider trading, the Code of Conduct provides:

Trading on inside information is a violation of federal securities law. Covered Parties in possession of material non-public information about the Company or companies with whom we do business must abstain from trading or advising others to trade in the respective company's securities from the time that they obtain such inside information until adequate public disclosure of the information. Material information is information of such importance that it can be expected to affect the judgment of investors as to whether or not to buy, sell, or hold the securities in question. To use non-public information for personal financial benefit or to "tip" others, including family members, who might make an investment decision based on this information is not only unethical but also illegal. Covered Parties who trade stock based on insider information can be personally liable for damages totaling up to three times the profit made or loss avoided by the respective Covered Party. You are required to read carefully and observe our Insider Trading Compliance Policy, as amended from time to time. Please contact the Company's General Counsel for a copy of this policy or with any questions you may have about insider trading laws.

65.     With regard to regarding reporting, accountability, and enforcement, the Code of

Conduct provides:

The Company promotes ethical behavior at all times and encourages Covered Parties to talk to supervisors, managers and other appropriate personnel, including the officers, outside counsel for the Company and the Board or the relevant committee thereof, when in doubt about the best
course of action in a particular situation.

Covered Parties should promptly report suspected violations of laws, rules, regulations or the Code to appropriate personnel, including officers, outside counsel for the Company and the Board or the relevant committee thereof. Reports may be made anonymously. If requested, confidentiality will be maintained, subject to applicable law, regulations and legal proceedings.

The Audit Committee of the Board or other appropriate officer or body shall investigate and determine, or shall designate appropriate persons to investigate and determine, the legitimacy of such reports. The Audit Committee or other

appropriate officer or body will then determine the appropriate disciplinary action. Such disciplinary action includes, but is not limited to, reprimand, termination with cause, and possible civil and criminal prosecution.

To encourage employees to report any and all violations, the Company will not tolerate retaliation for reports made in good faith. Retaliation or retribution against any Covered Party for a report made in good faith of any suspected violation of laws, rules, regulations or this Code is cause for appropriate disciplinary action.

66.     With regard to the accuracy of business records, the Code of Conduct provides:

All financial books, records and accounts must accurately reflect transactions and events, and conform both to generally accepted accounting principles (GAAP) and to the Company's system of internal controls. No entry may be made that intentionally hides or disguises the true nature of any transaction. Covered Parties should therefore attempt to be as clear, concise, truthful and accurate as possible when recording any information.

### *Audit Committee Charter*

67.     The Company's Audit Committee Charters states that the Audit Committee's

purposes shall be to:

- oversee the accounting and financial reporting processes and the systems of internal control over financial reporting of the Company and the audits, quality and integrity of the Company's financial statements and reports;
- take, or recommend that the Board of Directors of the Company (the "***Board***") take, appropriate action to oversee the qualifications, independence and performance of the independent registered public accounting firm or firms engaged as the Company's independent outside auditors for the purpose of preparing or issuing an audit report or performing other audit, review or attest services (the "***Auditors***");
- prepare and review the audit committee report required by the rules of the Securities and Exchange Commission (the "***SEC***") to be included in each annual meeting proxy statement of the Company in accordance with applicable SEC rules and regulations; and
- provide oversight assistance in connection with the Company's legal, regulatory and ethical compliance programs as established by management and the Board.

68.     The Audit Committee Charter sets forth a list of duties and responsibilities of the

Audit Committee. For instance, the Audit Committee Charter states that the Audit Committee's

responsibilities shall include the review of audited financial statements:

***Audited Financial Statement Review***. To review, upon completion of the audit, the financial statements proposed to be included in the Company's Annual Report on Form 10-K to be filed with the SEC, and to recommend whether or not such financial statements should be so included. Further, auditing literature, particularly Statement on Auditing Standards No. 100 (AU Section 722), defines the term "review" to include a particular set of required procedures to be undertaken by independent auditors. The members of the Committee are not independent auditors, and the term "review" as used in this Charter is not intended to have that meaning and should not be interpreted to suggest that the Committee members can or should follow the procedures required of auditors performing reviews of financial statements.

69.     The Audit Committee Charter also states that the Audit Committee's

responsibilities shall include the review of quarterly financial statements:

***Quarterly Results***. To review and discuss with management and the Auditors, as appropriate, the results of the Auditors' review of the Company's quarterly financial statements, prior to public disclosure of quarterly financial information, if practicable, or filing with the SEC of the Company's Quarterly Reports on Form 10-Q, and any other matters required to be communicated to the Committee by the Auditors under generally accepted accounting standards, including the standards of the PCAOB.

70.     The Audit Committee Charter directs that the Audit Committee review and discuss

Company disclosures with management:

***Management's Discussion and Analysis***. To review and discuss with management and the Auditors, as appropriate, the Company's disclosures contained under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations" in its periodic reports to be filed with the SEC.

71.     The Audit Committee Charter further requires that the Audit Committee review

the Company's press releases:

***Press Releases***. To review and discuss with management and the Auditors, as appropriate, earnings press releases and press releases containing other financial information, as well as the substance of financial information and earnings guidance provided to analysts and ratings agencies, which discussions may be general discussions of the type of information to be disclosed or the type of presentation to be made. The Chairperson may represent the entire Committee for purposes of this discussion. To the extent practicable, the Committee shall be furnished with an advance copy of each earnings release for its review prior to publication.

72.     The Audit Committee Charter requires that the Audit Committee confer with

management regarding the Company's internal controls over financial reporting:

> ***Internal Control Over Financial Reporting***. To confer with management and the
> Auditors, as appropriate, regarding the scope, adequacy and effectiveness of
> internal control over financial reporting including any special audit steps taken in
> the event of material control deficiencies. To review with management and the
> Auditors any fraud, whether or not material, that includes management or other
> employees who have any significant role in the Company's internal control over
> financial reporting and any significant changes in internal controls or other factors
> that could significantly affect internal controls, including any corrective actions in
> regard to significant deficiencies or material weaknesses. To review and
> recommend action relating to any report from the Auditors made pursuant to
> Section 10A of the Exchange Act of illegal acts which it believes are likely to have
> occurred and which would have an effect on the Company's financial statements,
> including any contingent monetary effects, such as fines, penalties and damages.

73.     The Audit Committee Charter also requires that the Audit Committee monitor the

Company's disclosure controls:

> ***Disclosure Controls and Procedures***. To review and discuss with management and
> the Auditors, as appropriate, the adequacy and effectiveness of the Company's
> disclosure controls and procedures.

74.     The Audit Committee Charter further requires that the Audit Committee oversee

the Company's compliance efforts:

> ***Ethical Compliance***. To review the results of management's efforts to monitor
> compliance with the Company's programs and policies designed to ensure
> adherence to applicable laws, regulations and rules, as well as to its Code of
> Conduct and Ethics, including review and oversight of related party transactions as
> required by Nasdaq and SEC rules (including without limitation those defined in
> Item 404 of Regulation S-K, but excluding any compensation-related matters), and
> to approve any waivers of the Code of Conduct and Ethics for an executive officer
> or director. The Committee shall administer the Company's policies regarding the
> review and approval of such transactions, if and as appropriate.

75.     The Individual Defendants violated the Code of Conduct, Company policy, and the

Company's corporate governance documents by engaging in or permitting the scheme to cause the

Company to engage in the Flawed Marketing Practices and to issue materially false and misleading

statements to the public, including in the Company's SEC filings, and by facilitating and disguising the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, abuse of control, gross mismanagement, violations of the Exchange Act, and failing to report the same. Moreover, one of the Individual Defendants violated the Code of Conduct by selling shares of the Company's common stock at inflated prices for aggregate proceeds in excess of $690,000. Further in violation of the Code of Conduct and the Company's policies, the Individual Defendants failed to maintain internal controls, failed to maintain the accuracy of Company records and reports, and failed to comply with applicable laws and regulations.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

76.     Aterian is a Delaware corporation based in New York, New York, that engages in e-commerce by developing, marketing, and selling consumer products. The Company generates revenue primarily through online sales of its consumer products. Substantially all of the Company's sales are made through Amazon's online marketplace.

77.     Aterian also operates its proprietary AIMEE software platform, which ostensibly combines data, AI, machine learning, and automation algorithms to rapidly identify and automate online sales and marketing of consumer products. In 2018, the Company began offering AIMEE to non-competing third-party brands as a "Software as a Service" ("SaaS"), which the Company has sometimes referred to as "Platform as a Service" ("PaaS").

78.     Prior to and during the Relevant Period, the Individual Defendants made or caused the Company to make statements that touted AIMEE's capabilities and positioned AIMEE as central to the Company's present and future success.

79.     Prior to and during the Relevant Period, the Individual Defendants caused the

Company to engage in the Flawed Marketing Practices, which posed an existential threat to the Company's relationship with Amazon. The purpose of engaging in the Flawed Marketing Practices was, at least in part, to disguise the failure of the Company's core business and the limited capabilities of AIMEE, which was not actually powered by AI.

80.     Furthermore, throughout the Relevant Period, the Individual Defendants made, or caused the Company to make, materially false and misleading statements concerning Aterian's business, operations, and prospects. Specifically, during the Relevant Period, the Company issued public statements that touted the Company's recent acquisitions of other e-commerce businesses and the capabilities of AIMEE. These statements were made, at least in part, to disguise the failure of the Company's core business and the limited capabilities of AIMEE, which was not actually powered by AI. In making or causing the Company to make these materially false and/or misleading statements, the Individual Defendants failed to disclose, *inter alia*, that: (1) AIMEE is an overhyped product with limited capabilities and customer interest; (2) AIMEE is not based on AI; (3) the Company engaged in the Flawed Marketing Practices, posing an existential risk to the Company's relationship with Amazon; (4) the Company's recent acquisitions were undertaken to obscure the failure of the Company's core business and artificially inflate its revenues; and (5) the Company failed to maintain adequate internal controls. As a result of the foregoing, Aterian's public statements were materially false and misleading at all relevant times

### Aterian Presents AIMEE's Capabilities as Central to the Company's Success

81.     From the time of its initial public offering in 2019 ("IPO"), the Individual Defendants have caused the Company to heavily tout AIMEE as the secret to its success. In conjunction with the IPO, the Company stated the following:

> Mohawk was founded on the premise that ***if a company selling consumer packaged goods ("CPG") was founded today, it would apply artificial intelligence***

> ***("A.I.") and machine learning, the synthesis of massive quantities of data and
> the use of social proof to validate high caliber product offerings*** as opposed to
> over-reliance on brand value and other traditional marketing tactics.

(Emphasis added.)

82.     Aterian listed seven strengths that differentiated the Company and would ostensibly
contribute to its success. For instance, one such strength touted the Company's "Highly Scalable
AI-Based Proprietary Technology Platform," stating:

> We believe our platform, AIMEE, allows us to rapidly and successfully identify
> new product opportunities and to launch, market and sell products in the rapidly
> growing global e-commerce market faster than the traditional brick-and-
> mortar CPG industry. We believe this brings tremendous competitive advantage in
> the fast-changing consumer goods landscape.

83.     The six other purported strengths also related to AIMEE, and included Defendant
Sarig's "knowledge of and passion for automation, AI and machine learning,"

84.     Representations regarding AIMEE's purported AI capabilities were material to
securities and market analysts, including at the National Securities Corporation and D.A. Davidson
& Co., who extolled AIMEE's purported AI functionality as a driver of and a catalyst for the
Company's growth in reports issued on July 11, 2019, and March 23, 2020, respectively.

**Former Employees Confirm AIMEE Is Not Artificial Intelligence**

85.     As described in the Corrected Amended Class Action Complaint filed in the
Consolidated Class Action, Dkt. No. 57 (the "Corrected Amended Complaint"), former employees
and customers have confirmed that AIMEE is not AI.[2]

86.     For instance, and as recounted in the Corrected Amended Complaint, a former

---

[2] Counsel for plaintiffs in the Consolidated Class Action interviewed these former Company
employees, and descriptions of those interviews contained in the Corrected Amended Complaint
filed in the Consolidated Class Action provide the basis for the statements attributed to them. All
former employees are referred to as confidential witnesses ("CWs") and in the masculine to
preserve their anonymity.

Chief Technology Officer that reported directly to Defendant Sarig from July 2015 until December 2016 ("CW1") stated that AIMEE was Defendant Sarig's "brainchild." CW1's statements to counsel in the Consolidated Class Action show Defendant Sarig's deep involvement with AIMEE. Specifically, CW1 stated that Defendant Sarig "was very hands on in the business at least when it came to AIMEE." However, CW1 stated that Defendant Sarig's "vision was very different than what it was in actuality." CW1 further stated that AIMEE accomplished only "rudimentary things" and "wasn't that sophisticated." CW1 described that "we would basically mimic somebody visiting a website, launched site and take the data from the site as if a person was looking at it rather than a bot." CW1 stated that "[i]t was branded and promoted as this Artificially Intelligent E-Commerce system. When I was there, it was crap. It was basically like scraping data from Amazon." CW1 concluded, "[i]t did not have Artificial Intelligence."

87.     Counsel in the Consolidated Class Action also interviewed an individual that served as Company's Head of Global Operations from June 2015 to October 2015 and as a Brand Manager from November 2015 to April 2017, who confirmed deficiencies with AIMEE ("CW2"). As Brand Manager, he handled Aterian's Vremi, Xtava, and Rif6 brands, with responsibility to grow the brands. During his tenure, he reported directly to Defendant Sarig. CW2 stated that, when Aterian hired CW2, it was "already pitching this whole concept of AIMEE." CW2 stated that "[t]here was this one guy Guspare (Bonventre) who is supposed to be a quantum math guy, he was not. He was the one that was in charge of building everything behind AIMEE. It turned out, AIMEE was nothing more than an advanced Excel sheet, not even advanced." CW2 stated that AIMEE is "a fancy version of a spreadsheet." Underscoring that programs such as Microsoft's Excel had capabilities similar to AIMEE, the Corrected Amended Complaint describes that CW2's interactions with AIMEE involved inputting data into AIMEE, including how much inventory

Aterian had of a certain product and how many units the Company was selling, and then AIMEE would calculate when inventory would run out.

88.     CW2 related to counsel in the Consolidated Class Action that during his tenure, Defendant Sarig led weekly meetings regarding AIMEE. CW2 recalled that the goal of AIMEE being able to scour Amazon's postings, analyze bad reviews, and identify opportunities for better products never transpired during his tenure at Aterian. Instead, CW2 manually conducted marketing research. CW2 stated that "AIMEE was non-existent. It was not a real tool." With respect to the Aterian brand "RSVP," CW2 stated that "AIMEE was not part of this [marketing] at all. The only thing that AIMEE did was sales and maybe some like operational stuff, like figuring out how much you can fit into a container for a shipment." CW2 stated that employees had to use "levers and marketing things to grow their business."

89.     With respect to the Company's PaaS, CW2 stated to counsel in the Consolidated Class Action that "there were always plans to upgrade it but during the time I was there it was all showmanship and talk, nothing actually came to life." Since CW2 left Aterian, others have told him that Aterian has not added anything to improve AIMEE.

90.     CW2 further stated to counsel in the Consolidated Class Action that Jeneq Management ("Jeneq")—a firm that conducted due diligence in connection with Aterian's IPO—contacted him with questions regarding Aterian's operations, its system, partnerships, and thoughts on leadership. When asked questions regarding his experience with AIMEE, CW2 told Jeneq that he did not see any artificial intelligence in AIMEE.

91.     Counsel in the Consolidated Class Action also interviewed a third former Company employee, who worked as Aterian's Senior Account Executive/Account Executive from January 2019 until September 2019 and reported to Aterian's Vice President of Sales ("CW3"). CW3

confirmed that the issues with AIMEE described by CW1 and CW2 persisted during his tenure. Regarding Aterian's SaaS/PaaS offering, CW3 stated that, upon his hiring, management misrepresented directly to him that AIMEE was artificial intelligence and was a fully developed SaaS product. Instead, he found that "it is not anyway ready for that. It is completely manual. I couldn't even run reports myself." CW3 further stated that "[i]t was nothing that was developed."

92.     CW3 stated to counsel in the Consolidated Class Action that "there is no such thing as artificial intelligence in the SaaS. They call things AI, it's like a buzz word. There is definitely a lot of human input." CW3 stated that the team responsible for overseeing AIMEE "kept trends. They watched for it when it was supposed to be a machine learning thing, but nothing was automated." With respect to AIMEE's connection through APIs to e-commerce platforms, CW3 continued that Aterian input information manually, including when adding new products to the system or changing prices.

93.     CW3 stated that Aterian customers "regularly" complained to him regarding AIMEE. He further stated that Aterian management "knew the product wasn't there. Myself and my boss told Yaniv Sarig and Fabrice Hamaide that it was not there and they were still trying to sell it. They became extremely frustrated and said that we can sell it. It will eventually develop." CW3 further stated that Aterian created a SaaS department prior to the IPO when the platform was not ready because management knew having a SaaS product would increase the Company's valuation. He stated that "there is a higher multiplier on SaaS than there is on just direct sales. They wanted that multiplier to be able to go public. It wasn't real. They knew the product didn't work. It was a multiplier unable to go public."

**Acquisitions Obscure AIMEE's Shortcomings**

94.     The Company has described a three-phase structure for its consumer goods, which

are produced under manufacturing contracts with suppliers mainly located in China:

> i.    Launch phase: During this phase, we leverage our technology to target opportunities identified using AIMEE. During this period of time, and due to the combination of discounts and investment in marketing, our net margin for a product could be as low as approximately negative 35%. Net margin is calculated by taking net revenue less cost of goods sold, less fulfillment, online advertising and selling expenses. These costs primarily reflect the estimated variable costs related to the sale of a product.
>
> ii.   Sustain phase: Our goal is for every product we launch is to enter the sustain phase and become profitable, with a target average of positive 15% net margin and within three months of launch on average. Net margin reflects a combination of manual and automated adjustments in price and marketing spend. Over time, our products benefit from economies of scale stemming from purchasing power both with manufacturers and with fulfillment providers.
>
> iii.  Milk phase or Liquidate phase: If a product does not enter the sustain phase or if the customer satisfaction of the product (i.e., ratings) is not satisfactory, then it will go to the liquidate phase and we will sell the remaining inventory. In order to enter the milk phase, we believe that a product must be well received and become a strong leader in its category in both customer satisfaction and volume sold as compared to its competition. Products in the milk phase that have achieved profitability should benefit from pricing power and we expect their profitability to increase accordingly. …

95.     At least as late as the filing of the Company's annual report for the 2020 Fiscal Year 2020 10-K (the "2020 10-K") on March 16, 2021, none of the Company's products have achieved the "milk" phase. Furthermore, in the 2020 10-K, the Company reported $185.7 million in net revenue, of which approximately $1.34 million, or *less than 1%*, was attributable to PaaS, with the remainder of the Company's net revenue coming from direct sales and sales to wholesalers. Thus, the Company faced serious problems generating revenue from SaaS/PaaS services, despite having started pilot programs in 2018.

96.     While the company's core business failing and AIMEE failed to generate SaaS business, the Company undertook a series of acquisitions to inflate the Company's revenues and obscure AIMEE's shortcomings.

97.     Specifically, on August 24, 2020, the Company announced it had entered into a definitive agreement to purchase the assets of Truweo, a consumer products company with a posture enhancer as its flagship product. Then, on December 1, 2020, the Company announced that it acquired the assets of four e-commerce brands: Mueller, Pursteam, Pohl and Schmitt, and Spiralizer. On February 2, 2021, the Company announced it had acquired the assets of Healing Solutions, LLC, a seller of essential oils.

### Aterian Exchanges Rebates and Free Products for Customer Reviews

98.     To further stimulate the Company's net revenues, the Individual Defendants caused the Company to engage in the Flawed Marketing Practices, which created an existential risk to the Company's relationship with Amazon.

99.     Amazon offers customers the opportunity to leave reviews regarding the quality and/or other characteristics of products purchased through its online marketplace.

100.    As explained by the Culper Report, the Company has offered its products for free or at highly discounted prices in exchange for reviews on online marketplaces such as the one operated by Amazon. A former Aterian Brand Manager interviewed by *Culper Research* stated that, during the individual's tenure with the Company, "you were allowed to give someone a product for free and then they can leave a review. And that counts as a verified purchase[.]"

101.    Former employees interviewed by counsel in the Consolidated Class Action have corroborated that the Company engaged in illicit marketing practices. For instance, CW1 noted that the Company fabricated fake reviews or offered free products for positive reviews, stating, "[t]here were thousands and thousands of 5-star reviews from their products, some of which were total crap." As a result, CW1 realized that the Company's product reviews could not be trusted.

102.    CW2 stated to counsel in the Consolidated Class Action that Aterian would inflate

new product launches with fake reviews. As Amazon's policies changed to disallow the practice of giving free or discounted products in exchange for reviews, the Company started giving rebates to customers, ultimately employing a method provided by CW2 to give gift cards to customers. Through that method, the Company would automatically add money to the gift cards, which functioned as credit cards. When customers applied for a product, money was added to their accounts. Then the customers would buy the product in question and verify the purchase. As stated by CW2, "There you go. You have a verified review."

103.    CW2 stated to counsel in the Consolidated Class Action that the falsifying of reviews "was very much ongoing forever," and that almost every one of the Company's products had inflated reviews. CW2 stated that the Company paid a "shady character" called Akemi Sue Fisher to inflate product reviews. As CW2 stated, "[e]very time products would get below a certain let's say rating or whatever, it would always be contact Akemi." CW2 explained that Defendant Sarig instructed him to message Akemi, and Akemi would respond with "Okay." According to CW2, Aterian paid for reviews weekly, and always paid for reviews when a product was pre-launch and post-launch. CW2 confirmed that Defendant Sarig knew all these practices. Furthermore, CW2 stated that, prior to instituting the credit card system in early 2016, Aterian gave money back to customers through Venmo or PayPal. CW2 further stated that Defendant Sarig came up with these ideas.

104.    CW3 also confirmed to counsel in the Consolidated Class Action that Aterian used rebate programs and paid for artificial reviews to pump up product offerings. Specifically, CW told counsel in the Consolidated Class Action that a lot of what they did were in bots, that "they [Aterian] would do it through Israel," and that Aterian inflated reviews "with these bots through Facebook."

105.    The Company's engagement in the Flawed Marketing Practices—as confirmed by the Culper Report and by interviews conducted by counsel in the Consolidated Class Action—posed existential risks to the Company's relationship with Amazon.

106.    Amazon maintains "Customer Reviews" policies regarding product reviews that prohibits sellers from exchanging products for reviews.[3] Violations of the Company's Customer Reviews policies include, but are not limited to, the following:

- A seller offers a third party a financial reward, discount, free products, or other compensation in exchange for a review on their product or their competitor's product. This includes using services that sell customer reviews, websites, or social media groups.
- A seller offers to provide a refund or reimbursement after the buyer writes a review (including reimbursement via a non-Amazon payment method), and asks the buyer to change or remove the review, before or after the refund or reimbursement. This could be done via buyer-seller messaging on Amazon or directly contacting customers or using 3rd party services, websites, or social media groups.
- A seller uses a third-party service that offers free or discounted products tied to a review (for example, a review club that requires customers to register their Amazon public profile so that sellers can monitor their reviews).

                    *                    *                    *

- A seller asks a reviewer to change or remove their review. They might also offer a refund or other compensation to a reviewer in exchange for doing so.

107.    Amazon's states that it has a "zero-tolerance policy" regarding violations of the Customer Reviews policies. Specifically, Amazon has stated the following regarding attempts to manipulate customer reviews:

> Amazon has a zero-tolerance policy towards any customer reviews violations. If we detect any attempts to manipulate customer reviews, we take immediate actions that include, but are not limited to:
> - ***Immediate and permanent withdrawal of the seller's selling privileges on Amazon and withholding of funds.***
> - The removal of all the product's reviews and preventing the product from receiving future reviews or ratings.
> - ***Permanent delisting of the product from Amazon.***

---

[3] https://sellercentral.amazon.com/gp/help/external/GYRKB5RU3FS5TURN?language=en_US (last accessed 10/21/2021).

- ***Legal action against the seller, including lawsuits and referral to civil and criminal enforcement authorities.***
- Disclosing the seller's name and other related information publicly.

(Emphasis added.)

108.     Amazon maintained these Customer Reviews Policies and a zero-tolerance enforcement scheme throughout the Relevant Period and into the present.[4]

109.     Despite the severe consequences for Amazon sellers that can result from violations of the Customer Reviews Policies, the Company engaged in the Flawed Marketing Practices during the Relevant Period. As detailed in the Culper Report, published on May 4, 2021, "the Company's 'vremi' brand ***still offers 60% to 100% rebates***." (Emphasis added.) Furthermore, the Culper Report detailed that the Company has submitted a trademark application for the mark DEALMOJO™, which is "intended to cover the category of affiliate marketing."

110.     Engagement in the Flawed Marketing Practices posed an existential risk to the Company because substantially all of the Company's sales occur on Amazon's online marketplace.

111.     Thus, by causing the Company to engage in the Flawed Marketing Practices, posing great risk to the Company's relationship with the platform upon which *substantially all* of the Company's sales are executed, the Individual Defendants breached their fiduciary duties to the Company.

112.     In further breach of their fiduciary duties, the Individual Defendants made or caused the Company to make false and/or materially misleading statements that failed to disclose the Company's engagement in the Flawed Marketing Practices and the resulting risks posed to the

---

[4]https://web.archive.org/web/20201024072926/https://sellercentral.amazon.com/gp/help/external/GYRKB5RU3FS5TURN?language=en_US&ref=efph_GYRKB5RU3FS5TURN_cont_521m (October 24, 2020); *see also* https://sellercentral.amazon.com/gp/help/external/GYRKB5RU3FS5TURN?language=en_US (last accessed 10/21/2021).

Company, which were highly material to the Company's business, operations, and prospects.

**False and Misleading Statements Made Prior to the Relevant Period**

*August 25, 2020 Prospectus*

113.   On August 25, 2020, the Company filed a prospectus on Form 424B5 (the "August 2020 Prospectus"). The August 2020 Prospectus contained the following statement:

> We believe we are reinventing how to rapidly and successfully identify new product and market opportunities, and to launch, autonomously market and sell products in the rapidly growing global e-commerce market by leveraging our proprietary software technology platform, known as AIMEE. ***AIMEE combines large quantities of data, A.I., machine learning and other automation algorithms, at scale, to allow rapid opportunity identification and automated online sales and marketing of consumer products.***
>
> AIMEE sources data from various e-commerce platforms, the internet and publicly available data, allowing us to estimate and determine trends, performance and consumer sentiment on products and searches within e-commerce platforms. This functionality allows us to help determine which products to market, manufacture through contract manufacturers, import and sell on e-commerce marketplaces. AIMEE is also connected, through APIs, to multiple e-commerce platforms. ***This allows us to automate the purchase of marketing, automate various parts of our fulfillment and logistics operations and to automate the pricing changes on product listings.*** …

114.   The statements referenced in ¶113 were materially false and misleading because the Individual Defendants failed to disclose that: (1) AIMEE had limited capabilities and was not AI; (2) as a result, AIMEE required significant human input; and (3) as a result of the foregoing, AIMEE could not act autonomously.

*November 9, 2020 Form 10-Q*

115.   On November 9, 2020, the Company filed its quarterly report on Form 10-Q with the SEC for the quarter ended September 30, 2020 (the "3Q20 10-Q"). The 3Q20 10-Q contained the following statements:

> We believe we are reinventing how to rapidly and successfully identify new product and market opportunities, and to launch, autonomously market and sell products in

the rapidly growing global e-commerce market by leveraging our proprietary software technology platform, known as AIMEE. ***AIMEE combines large quantities of data, A.I., machine learning and other automation algorithms, at scale, to allow rapid opportunity identification and automated online sales and marketing of consumer products.***

AIMEE sources data from various e-commerce platforms, the internet and publicly available data, allowing us to estimate and determine trends, performance and consumer sentiment on products and searches within e-commerce platforms. This functionality allows us to help determine which products to market, manufacture through contract manufacturers, import and sell on e-commerce marketplaces. AIMEE is also connected, through APIs, to multiple e-commerce platforms. ***This allows us to automate the purchase of marketing, automate various parts of our fulfillment and logistics operations and to automate the pricing changes on product listings.*** …

116.    The statements referenced in ¶115 were materially false and misleading because the Individual Defendants failed to disclose that: (1) AIMEE had limited capabilities and was not AI; (2) as a result, AIMEE required significant human input; and (3) as a result of the foregoing, AIMEE could not act autonomously.

117.    The 3Q20 10-Q also states that "[w]e have launched numerous products over the last several quarters and have experienced a lower than expected success rate of products reaching the sustain phase. In addition, in certain instances, even when a product has reached the sustain phase, our forecasts, at times, have resulted in inventory overages." This statement was materially misleading because the Individual Defendants failed to disclose that AIMEE was not an AI product, and therefore did not have the capacity to autonomously identify and market opportunities. As a result, the Company's low level of success was no unanticipated but was merely lower than the Company had advertised.

118.    The 3Q 20 10-Q also stated as follows:

On September 10, 2019, we completed the acquisition of the assets of a personal wellness company (the "Aussie Health Assets"), and ***on August 26, 2020, we completed the acquisition of assets of a consumer product business (the "Truweo Assets"). We may in the future seek to acquire or invest in other businesses, features or technologies that we believe could complement or expand our market,***

*enhance our technical capabilities or otherwise offer growth opportunities.* The pursuit of potential acquisitions may divert the attention of management and cause us to incur various expenses in identifying, investigating and pursuing suitable acquisitions, whether or not they are consummated.

(Emphasis added.)

119.     The statements referenced in ¶118 were materially false and misleading because the Individual Defendants failed to disclose that the Company acquired the Truweo Assets to obscure that AIMEE lacked the requisite artificial intelligence to be used to identify product opportunities and automate the development of new products.

**False and Misleading Statements Made During to the Relevant Period**

*March 16, 2021 Form 10-K*

120.     On March 16, 2021, the Company filed the 2020 10-K with the SEC. The 2020 10-K was signed by Defendants Sarig, Rodriguez, Kurtz, Petersen, von Walter, and Harlam, and contained certifications, signed by Defendants Sarig and Rodriguez, pursuant to Rules 13a-14(a) and 15d-14(a) promulgated under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") attesting to the accuracy of the financial statements contained in the 2020 10-K, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

121.     The 2020 10-K stated as follows:

*We rely on AIMEE and other information technologies and systems to operate our business and to maintain our competitiveness, and any failure to invest in and adapt to technological developments and industry trends could harm our business.*

We depend on the use of our proprietary technology platform named AIMEE and other sophisticated information technologies and systems, including technology and systems used for websites and apps, customer service, logistics and fulfillment, supplier connectivity, communications and administration. Artificial intelligence and machine learning technologies are subject to rapid changes and our technology is yet to be fully automated. As our operations grow in size, scope and complexity, including through acquisitions, we will need to continuously improve and upgrade

our systems and infrastructure to offer an increasing number of consumer-enhanced services, features and functionalities, while maintaining and improving the reliability and integrity of our systems and infrastructure.

Our future success also depends on our ability to adapt AIMEE, our services and infrastructure, including our research, sales and marketing, and logistics and fulfillment platform which leverages AIMEE, to meet rapidly evolving e-commerce trends and demands while continuing to improve our software's performance, features and reliability. The emergence of alternative platforms may require us to continue to invest in new and costly technology. We may not be successful, or we may be less successful than our competitors, in developing technologies that operate effectively across multiple e-commerce platforms, which would negatively impact our business and financial performance. New developments in other areas, such as cloud computing providers and other technological changes, could also make it easier for competitors to enter our markets due to lower up-front technology costs. In addition, we may not be able to maintain our existing systems or replace our current systems or introduce new technologies and systems as quickly or cost effectively as we would like. We expect to incur significant costs in the development of AIMEE's functionality, and any failure to invest in and adapt to technological developments and industry trends may have a material adverse effect on our business, results of operations, financial condition and prospects.

122.    The statements referenced in ¶121 were materially false and misleading because the Individual Defendants failed to disclose that (1) the risk of failure to develop AI and machine learning had already materialized at the time the 2020 10-K was filed; (2) that failure had already harmed the Company's business and financial performance at the time of the 2020 10-K.

123.    The 2020 10-K included the following statement asserting that AIMEE was based on AI technology:

We believe we are reinventing how to rapidly and successfully identify new product and market opportunities, and to launch, autonomously market and sell products in the rapidly growing global e-commerce market by leveraging our proprietary software technology platform, known as AIMEE. *AIMEE combines large quantities of data, AI, machine learning and other automation algorithms*, at scale, to allow rapid opportunity identification and automated online sales and marketing of consumer products.

AIMEE sources data from various e-commerce platforms, the internet and publicly available data, allowing us to estimate and determine trends, performance and

consumer sentiment on products and searches within e-commerce platforms. This functionality allows us to help determine which products to market, manufacture through contract manufacturers, import and sell on e-commerce marketplaces. AIMEE is also connected, through application program interfaces ("APIs"), to multiple e-commerce platforms. ***This allows us to automate the purchase of marketing, automate various parts of our fulfillment and logistics operations and to automate pricing changes on product listings.*** …

(Emphasis added.)

124.    The statement referenced in ¶123 was materially misleading because it failed to disclose that: (1) AIMEE was not an AI engine and had limited capabilities; (2) AIMEE is unable to identify new product and market opportunities and requires human input to manually analyze data; (3) AIMEE was unable to autonomously launch or market products; (4) AIMEE did not autonomously automate marketing, or various parts of the Company's fulfillment and logistics operations, and instead the Company input the information manually.

125.    The 2020 10-K also stated that "AIMEE's idea generator functionality quickly analyzes and filters millions of shopping-related data points to identify product opportunities, including relevant product specifications, based on consumer sentiment, product trends and attributes and competitive landscape analysis, among other things." This statement was materially false and misleading because the Individual Defendants failed to disclose that: (1) AIMEE is not AI, and instead required significant human input and analysis; and (2) AIMEE required significant human effort to meet the goal of analyzing data or identifying new product opportunities.

126.    The 2020 10-K also stated as follows: "We have also leveraged AIMEE to buy (acquire through acquisition) consumer product brands and related products. During 2020, we acquired the brands Truweo, Mueller, Pursteam, Pohl and Schmitt, and Spiralizer and their related products and during 2019, we acquired the brand Aussie Health." These statements were materially false and misleading because Defendants failed to disclose that the Company undertook the acquisitions to obscure AIMEE's lack of artificial intelligence. In fact, AIMEE lacked the AI to

identify product opportunities and automate product cycles, and the Individual Defendants undertook a scheme to acquire other consumer products companies to artificially inflate the Company's revenues to levels that the Individual Defendants asserted could be achieved with AIMEE.

127.    Regarding the Company's PaaS/SaaS services, the 2020 10-K made the following statement:

> We believe AIMEE is uniquely equipped to add value to brands and manufacturers in this emerging paradigm, leveraging real-time analytics and sales automation to help brands more effectively manage their marketplace strategy. ***We believe that our PaaS solution, which includes combined access to our team's expertise and the AIMEE platform, could provide a significant advantage over other competitors in this industry.*** We believe this is because many incumbent CPG companies have historically operated as business-to-businesses and have not invested sufficiently to succeed on online marketplaces. With a PaaS solution, we believe we can bridge this operational gap by offering our technology combined with our substantial know-how in managing business-to-consumer supply chains, marketing, and customer service, among other things. ***We continue to offer our Platform as a Service solution through pilot programs to brands and manufacturers.*** Our offering provides substantially the same capabilities utilized for our owned and operated portfolio of products.

(Emphasis added.)

128.    The statements referenced in ¶127 were materially false and misleading because the Individual Defendants knew that: (1) they were selling a product that did not have AI; and (2) the flawed SaaS/PaaS product was the subject of frequent customer complaints and provided users with no competitive advantage.

***March 19, 2021 Proxy Statement***

129.    On March 19, 2021, the Company filed its Schedule 14A with the SEC (the "March 2021 Proxy Statement"). Defendants Sarig, Harlam, Kurtz, Petersen, and von Walter solicited the March 2021 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained

material misstatements and omissions.[5]

130.    The March 2021 Proxy Statement called for Company shareholders to approve eight proposals at a special meeting on April 1, 2021 (the "Special Meeting") and to conduct any other business properly brought before the Special Meeting. The proposals included the following ("Proposal No. 4"):

> To approve, as required by and in accordance with Nasdaq Listing Rules 5635(a) and 5635(d), the issuance of up to 1,016,912 shares of the Company's common stock pursuant to the Asset Purchase Agreement, dated February 2, 2021, by and among the Company, Truweo, LLC, Healing Solutions, LLC, Jason R. Hope and, for purposes of certain sections thereof, Super Transcontinental Holdings LLC, including pursuant to certain consulting agreements entered into in connection therewith.

131.    The March 2021 Proxy Statement stated the following regarding the Healing Solutions acquisition:

> On February 2, 2021 (the "Closing Date"), we and our wholly owned subsidiary Truweo, LLC, a Delaware limited liability company ("Acquisition Sub"), entered into and closed the transactions contemplated by the Asset Purchase Agreement (the "Asset Purchase Agreement") with Healing Solutions, LLC, a Delaware limited liability company ("Healing Solutions"), Jason R. Hope and, only for the purposes of certain sections thereof, Super Transcontinental Holdings LLC, a Delaware limited liability company. Pursuant to the Asset Purchase Agreement, we, among other things, purchased and acquired certain of Healing Solutions' assets related to Healing Solutions' retail and ecommerce business under the brands Healing Solutions, Tarvol, Sun Essential Oils and Artizen (among others), which is conducted through certain physical locations, virtual channels or websites, including amazon.com and healingsolutions.com (the "Asset Purchase"), and Acquisition Sub assumed certain liabilities of Healing Solutions.

> As consideration for the Asset Purchase, we (i) paid to Healing Solutions $15,280,173 in cash (the "Cash Purchase Price") and (ii) issued 1,387,759 shares of Common Stock to Healing Solutions, the cost basis of which was $24.01 (such

---

[5] Plaintiff's allegations with respect to the misleading statements in the March 2021 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

basis being the volume-weighted average closing price per share of Common Stock, as reported on The Nasdaq Stock Market LLC, for the 10 consecutive trading days ending on the trading day immediately prior to the Closing Date) (the "Closing Shares"). At the closing of the Asset Purchase (the "Closing"), we withheld $1,993,496 of the Cash Purchase Price to serve as collateral for Healing Solutions' payment of certain overdue trade payables to be released to Healing Solutions in accordance with the terms of the Asset Purchase Agreement.

In addition to the Cash Purchase Price and the Closing Shares, following the Closing, Healing Solutions is also entitled to receive (i) 170,042 shares of Common Stock in respect of certain inventory acquired under the Asset Purchase Agreement (the "Inventory Consideration Shares"), as such number of shares shall be adjusted (up to a maximum of 280,000 shares) pursuant to the terms thereof, and (ii) subject to the conditions set forth in the Asset Purchase Agreement, the Earn-Out Shares (as described below). The Inventory Consideration Shares shall be issued to Healing Solutions following the final determination of inventory values pursuant to the terms of the Asset Purchase Agreement, which determination is expected to occur approximately nine to ten months following the Closing Date and such shares shall be subject to vesting restrictions which shall lapse on the date that is the one year anniversary after the Closing Date.

Pursuant to the terms of the Asset Purchase Agreement, Healing Solutions is required to use its commercially reasonable efforts to identify one or more suppliers (other than Healing Solutions) of finished goods inventory of all SKUs that constitute assets acquired in the Asset Purchase ("New Suppliers") and to initiate discussions with such New Suppliers for the purpose of negotiating new supply agreements between us or our affiliates, on the one hand, and the New Supplier, on the other hand, for the purchase of such SKUs following the Closing on terms acceptable to us in our sole discretion, acting reasonably. If, on or before the date that is 15 months after the Closing Date, an Earn-Out Consideration Event (as defined below) has occurred, then Healing Solutions shall be entitled to receive up to a maximum of 528,670 shares of Common Stock (the "Earn-Out Shares"), which number of shares is subject to reduction in accordance with the terms of the Asset Purchase Agreement based on the time period within which the Earn-Out Consideration Event occurs (if it occurs at all). An "Earn-Out Consideration Event" means the latter to occur of (i) us having entered into supplier agreements with New Suppliers in respect of each SKU that constitutes an asset acquired in the Asset Purchase and (ii) us having terminated each of the services provided to us under a transition services agreement that we entered into with Healing Solutions on the Closing Date such that no services are being provided thereunder.

The aggregate maximum number of shares of Common Stock that are issuable to Healing Solutions under the Asset Purchase Agreement, excluding the Closing Shares that have already been issued, is 808,670 shares.

In connection with the Asset Purchase Agreement and as of the Closing Date, we

also entered into consulting agreements (the "Consulting Agreements") with each of Richard Perry, Christopher Marshall and Quinn McCullough (collectively, the "Consultants"). The Consultants will provide certain consulting services to us for up to 15 months and if there is an Earn-Out Consideration Event, we may issue up to a maximum of 208,242 shares of Common Stock to the Consultants in the aggregate (the "Consulting Shares"), which number of shares is subject to reduction based on the time period within which the Earn-Out Consideration Event occurs under the Asset Purchase Agreement (if it occurs at all). As provided in the Consulting Agreements, if the Consultant is not an "accredited investor" as defined in Regulation D under the Securities Act of 1933, as amended (the "Securities Act"), such Consultant may receive cash in lieu of shares of Common Stock pursuant to the terms of the Consulting Agreement.

The foregoing summaries of the Asset Purchase Agreement and the Consulting Agreements do not purport to be complete and are qualified in their entirety by reference to the full text of the Asset Purchase Agreement and the Consulting Agreements, which we filed as Exhibits 2.1, 10.5, 10.6 and 10.7, respectively, to our Current Report on Form 8-K that we filed with the SEC on February 3, 2021, which are incorporated herein by reference.

132.    The March 2021 Proxy Statement contained the following recommendation regarding the proposal seeking shareholder approval for the issuance of shares in connection with the acquisition of Healing Solutions:

Our Board believes approval of Proposal No. 4 is in the best interests of our Company and our stockholders. If Proposal No. 4 is not approved, then we will not be able to issue the Inventory Consideration Shares, the Earn-Out Shares or the Consulting Shares pursuant to the Asset Purchase Agreement or the Consulting Agreements, and we would be in breach of such agreements. We may then be required to make cash payments in lieu of the Inventory Consideration Shares, the Earn-Out Shares or the Consulting Shares, which would reduce our cash resources. Accordingly, we believe approval of Proposal No. 4 is critical as it will give us the ability to meet our obligations to issue the Inventory Consideration Shares, the Earn-Out Shares and the Consulting Shares, which will help to preserve our cash resources for our planned operating activities.

133.    The March 2021 Proxy Statement was materially misleading because it failed to disclose that the Proposal No. 4 was not in the best interests of the Company, as the Company had overpaid for the assets of Healing Solutions, the business of which was in major part driven by sales of hand sanitizer, which had likely peaked. The March 2021 Proxy Statement also failed to

disclose that Healing Solutions took delivery of its last hand sanitizer shipment on August 31, 2020. Furthermore, and as described above, the acquisition of Healing Solutions was just one of a series of acquisitions the Company undertook to inflate the Company's revenues and obscure the failure of the Company's core business and the limitations of AIMEE, which was not based on AI.

134.     In addition, the March 2021 Proxy Statement was materially false and misleading because it failed to disclose that: (1) AIMEE is an overhyped product with limited capabilities and customer interest; (2) AIMEE is not based on AI; (3) the Company engaged in the Flawed Marketing Practices, posing an existential risk to the Company's relationship with Amazon; (4) the Company's recent acquisitions were undertaken to obscure the failure of the Company's core business and artificially inflate its revenues; and (5) the Company failed to maintain adequate internal controls. As a result of the foregoing, Aterian's public statements were materially false and misleading at all relevant times

135.     As a result of the material misstatements and omissions contained in the March 2021 Proxy Statement, Company shareholders approved Proposal No. 4, in effect finalizing the acquisition of Healing Solutions' assets.

## The Truth Emerges

136.     On May 4, 2021, *Culper Research* published the Culper Report. Summarizing its findings, the Culper Report stated that the Company "is promoting what we believe is an overhyped 'AI' narrative and a string of garbage acquisitions to mask the failure of its already ill-conceived core business."

137.     The Culper Report continued:

Aterian (f.k.a. Mohawk Group Holdings) was founded by Maximus Yaney and Asher Delug. Yaney is a felon who spent 18 months in prison for wire and bank fraud. Delug continues to pump ATER stock on both Twitter and StockTwits amid his post-IPO lock-up expiration in March 2021. Aterian's CEO Yaniv Sarig holds

himself out as a visionary, yet he appears to us more of a bit hustler. Just prior to his becoming CEO at Aterian, Sarig participated in the failed Reg A+ IPO attempt of Bitzumi, a cryptocurrency business co-founded by widely derided crypto promoter James Altucher. ***We understand that Aterian has been largely unsuccessful in convincing other Amazon sellers to pay for its "AIMEE" AI platform, and at least 5 former employees and a former customer have expressed doubts regarding AIMEE's legitimacy. We think that Aterian's underlying business has failed, forcing the Company to obscure its poor performance with a series of questionable acquisitions.***

(Emphasis added.)

138. The Culper Report identified problems with the Company's growth:

We believe that there are serious problems with Aterian's claims to maintain strong organic growth and to drive M&A synergies: to us, neither of these appears to be the case. We estimate that even with zero YoY growth, Aterian's acquisitions should be contributing $34 million of EBITDA in 2021, against a Company-wide midpoint guide of just $32 million. ***In our view, this suggests not only that Aterian is unable to grow EBITDA at acquired businesses, but that its core business is also failing to produce. We estimate the Company's own 2021 revenue guidance implies just 16% organic growth, both a massive year-over-year deceleration, and a departure from claims to maintain consistent growth in the core business. We think this stems from Aterian's wildly oversold claims of its AI platform, AIMEE***:

-AIMEE has been in "pilot programs" with third-party customers since 2018, yet revenues remain miniscule and decreased from 2019 to 2020. One former customer stated of the Company's claims of its abilities that, "there's maybe one-third of the data that they actually had" and "we were just like a little oversold."

- Former employees characterize AIMEE as "very simple" and questioned "how much of this is AI, and how much of this is 3 or 4 very smart people with Monster Energy drinks using a computer."

- Aterian intends for each product launch to move into the "sustain" phase, characterized by 10% margins, then the "milk" phase, where pricing power yields increased profitability. Yet despite claims that the AI improves over time, Aterian has launched 69 products since Q1 2019, and not a single one has successfully reached the "milk" phase. Moreover, the Company's own Form 10-K filed in March 2021 disclosed a "lower than expected success rate of products reaching the sustain phase" indicating what appears to be a trend of worsening results on the Company's product launches.

(Emphasis added.)

139. The Culper Report also identified problems with the Company's Flawed Marketing

Practices and its claims regarding AI:

> We believe Aterian's backbone is not AI, but a smattering of "gray area" tactics of the type that have regularly gotten sellers booted from Amazon. ***For example, the Company's Vremi brand currently advertises 60% to 100% off rebates on ice makers***, and Aterian also runs Facebook groups such as the "Secret Deal Explorers", which offer free or highly discounted product in exchange for reviews. Relying on these pay-to-play reviews is not only a far cry from Aterian's claims that "artificial intelligence" drives successful product launches, but suggests an unstable and existentially risky business model. ***Per a former employee, "If you had gotten to 2,000 reviews or something, Amazon would wipe out 1,900 reviews … It happened so many times—Amazon would come back and just shut down your listing. There were weeks when we lost half our revenue."***

(Emphasis added.)

140. The Culper Report further stated that "[w]e think Aterian turned to acquiring garbage as its core promotion has failed."

141. With respect to the Company's acquisition of Healing Solutions, the Culper Report made the following statement underlining that the Company's acquisition strategy led to poor results:

> We believe Aterian misrepresents this acquisition as a "recurring revenues" essential oils business rather than what it actually is: a re-seller of Chinese hand sanitizers whose revenues likely peaked last summer and are never coming back. ***Alleged fraudster Hope himself even said "the terms we got from Aterian were far superior to other offers…" confirming our view that Aterian has been taken for a ride.***

(Emphasis added.)

142. In analyzing Healing Solutions' acquisitions of hand sanitizer, the Culper Report stated that "import records also show that ***Healing Solutions took delivery of its last hand sanitizer shipment on August 31, 2020***, suggesting to us that this business has peaked and is never coming back." (Emphasis added.)

143. The Culper Report also discussed the December 2020 acquisitions of Mueller, Pursteam, Pohl and Schmitt, and Spiralizer, which it referred to as "the Smash Assets." The Culper Report noted that "Aterian claimed the Smash Assets generated $77.5 million in revenues and $13.1 million in operating income for the last twelve months, yet even 5 months post-acquisition,

Aterian remains unable to file audited financials for the acquired business."

144.    The Culper Report also asserted that "Aterian Isn't an Artificial Intelligence Company; It's a Reseller of Cheap Chinese Goods." *Culper Research* interviewed "[n]umerous former employees" to corroborate its view that "***AIMEE is mostly a stock promotion tool with limited capabilities***." (Emphasis added.) A former Technology Executive at the Company stated the following to *Culper Research*:

> Right. ***So the reality is, when I was there, it was not, even though it was called an AI engine, it was not.*** That's the truth. Even though we applied natural language processing in some places and sentiment analysis, it just wasn't where the full vision wanted it to be, and so it was a lot of automation and, like you said, rules processing versus actual AI...

(Emphasis added.)

145.    According to the Culper Report, a former executive at the Company similarly confirmed that AIMEE was not AI:

> When I was there, a lot of it was the story ... a lot of the things that were being worked on that were in the AI were things that were more visual progress. Bots that would allow PMs to make queries in natural language about trend forecasts, inventory forecasts. Random things that ***when you zoom out, you're like, is this the AI?***

(Emphasis added.)

146.    In addition, a former Business Development Executive stated the following:

> Mohawk [Aterian] has a program called AIMEE which they advertise and which works pretty well, but it's very simple, my understanding of what AIMEE does.

> There's a lot of wild-goose chases with the management. And there's definitely some grey area actions in terms of like how we make things successful, which are totally above board, but they're grey in the sense that how scalable are these things, how much of this is AI, and how much of this is 3 or 4 very smart people with Monster Energy drinks using a computer.

147.    The Culper Report also exposed the Flawed Marketing Practices, stating, "Aterian promotes AI, but hides its Facebook groups and rebate programs." The Culper Report stated: "Aterian claims its backbone is its AI. However, Aterian appears to hide underhanded, 'gray area'

tactics such as paid reviews. We believe these hacks are what truly drive Aterian's product 'discovery', and understand that *Aterian frequently toes the line of Amazon's terms*." (Emphasis added.)

148.   The Culper Report quoted a former Company Brand Manager as stating: "To start, for example, when I was first there, you were allowed to give someone a product for free and then they can leave a review. And that counts as a verified purchase…" The same individual stated that the manager of the Company's kitchen brand was using poor-quality manufacturers "because they were cheap and all those products were garbage and they would just pump it up with reviews to make it seem like it's actually a good product." Furthermore, the same Brand Manager stated: "But the truth is, they would find any product and they would just put it up. And then if it didn't work, they would use reviews, like get people to write reviews."

149.   The Culper Report also quoted a former Business Development Executive at the Company, who stated: "It's something that requires a lot of human ingenuity, to require sort of grey hat marketing moves, things like a lot of brands, speaking broadly, have publicly available Facebook groups, where they can promote their products and offer rebates on their products." The same Business Development Executive noted the risks facing the Company: "In fact, that Amazon could take a bite of the business at any moment."

150.   The Culper Report further noted that,

While Aterian continually trumpets the narrative that it is AI-driven, we find that the Company has implemented these more underhanded tactics while shielding them from investors' view. See that on November 21, 2019, Aterian applied for a trademark registration for "Secret Deal Explorers" which is "intended to cover the category of affiliate marketing services." Secret Deal Explorers' Facebook page states that the entity "is a FB chat that people purchase using secret words!" while displaying photos of a hair dryer, projector, egg beater, and crock pot – coincidentally all of which are items sold by Aterian[.]

151.   The Culper Report provided further analysis showing the Company's engagement

in the Flawed Marketing Practices:

> It appears to us that Aterian may have leaned upon Facebook groups such as these both to promote and to solicit reviews for its products using the prospect of giveaways as bait. Secret Deal Explorers' last Facebook post was in February 2020, yet it seems that similar programs remain ongoing. ***For example, on January 27, 2021, Aterian applied a trademark registration for "DEALMOJO", which is also "intended to cover the category of affiliate marketing."***

(Emphasis added.)

152.    The Culper Report noted that, "In some cases, the Company doesn't even appear to be hiding its tactics." Linking the Flawed Marketing Practices to the Relevant Period, the Culper Report stated "that the Company's 'vremi' brand ***still offers 60% to 100% rebates***." (Emphasis added.).

153.    The Culper Report noted that the Company's engagement in the Flawed Marketing Practices "comes with a set of ***existential risks***." (Emphasis added.) The Culper Report quoted a former R&D Executive at the Company as follows:

> They definitely did have a few Facebook groups that had that [paid reviews]... I think they got shut down pretty quickly. It was like, fuzzy, in terms of what violates terms and service and what not ... If you had gotten to 2,000 reviews or something, Amazon would wipe out 1,900 reviews ... It happened so many times—Amazon would come back and just shut down your listing. ***There were weeks when we lost half our revenue.*** The amount of scraping on Amazon that we were doing... Yeah, that's a risk that Mohawk [Aterian] has always faced ... You're slaves to the Amazon platform.

(Emphasis added.)

154.    *Culper Research* also spoke to an industry expert at one of the Company's competitors, who further emphasized the risks posed by engaging in the Flawed Marketing Practices:

> If they've done that [promoted Facebook groups and free product for reviews] in the last year and a half, I'd be extremely concerned. Amazon has done nothing but tighten down. Amazon doesn't care if you're doing $50 million a year on their site—you break the rules, you get shut down. I couldn't even imagine being at a

publicly traded company and doing that. That is sketchy … Amazon's getting smarter and smarter at catching those people.

155.    On this news, the price of the Company's common stock fell from its closing price of $20.66 on May 3, 2021 to close on May 5, 2021 at $15.72, a decline of $4.94, or approximately 24%, over two days.

156.    On May 5, 2021, the Company published a press release denying the claims in the Culper Report. However, the Company did not refute the allegation that AIMEE was not AI.

## DAMAGES TO ATERIAN

157.    As a direct and proximate result of the Individual Defendants' misconduct, Aterian has lost and will continue to lose and expend many millions of dollars.

158.    Such expenditures include, but are not limited to, the fees associated with the Consolidated Class Action filed against the Company and Defendants Sarig, Hamaide, and Rodriguez, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

159.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

160.    As a direct and proximate result of the Individual Defendants' conduct, Aterian has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

161.    Plaintiff brings this action derivatively and for the benefit of Aterian to redress

injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their

fiduciary duties as directors, and/or officers of Aterian, unjust enrichment, abuse of control, gross

mismanagement, waste of corporate assets, violations of the Exchange Act, the aiding and abetting

thereof, as well as for contribution under Sections 10(b) and 21D of the Exchange Act.

162.    Aterian is named solely as a nominal party in this action. This is not a collusive

action to confer jurisdiction on this Court that it would not otherwise have.

163.    Plaintiff is, and has been at all relevant times, a shareholder of Aterian. Plaintiff

will adequately and fairly represent the interests of Aterian in enforcing and prosecuting its rights,

and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce

and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

164.    Plaintiff incorporates by reference and realleges each and every allegation stated

above as if fully set forth herein.

165.    A pre-suit demand on the Board of Aterian is futile and, therefore, excused. At the

time of filing of this action, the Board consists of the following five individuals: Defendants Sarig,

Harlam, Kurtz, Petersen, and von Walter (the "Director-Defendants"). Plaintiff needs only to

allege demand futility as to three of five Director-Defendants who are on the Board at the time this

action is commenced.

166.    Demand is excused as to all of the Director-Defendants because each one of them

faces, individually and collectively, a substantial likelihood of liability as a result of the scheme

they engaged in knowingly or recklessly to make and/or cause the Company to make false and

misleading statements and omissions of material facts, while one of them conducted insider sales

for proceeds of approximately $690,000, which renders them unable to impartially investigate the

charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

167.     In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in the foregoing scheme. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

168.     Additional reasons that demand on Defendant Sarig is futile follow. Defendant Sarig has served as director, President, and CEO of the Company since September 2018. He co-founded the Company's predecessor entity, Aterian Group, Inc. (f/k/a Mohawk Group, Inc.) ("Aterian Opco"), and continues to serve that entity as director, President, and CEO. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Sarig with his principal occupation for which he receives handsome compensation, including more than $2.4 million in the 2020 Fiscal Year. In addition, during the Relevant Period, he sold 20,108 shares of Company common stock at artificially inflated prices for proceeds of approximately $690,000. As President and CEO, Defendant Sarig was ultimately responsible for all of the false and misleading statements and omissions that were made during the Relevant Period, including the statements contained in the 2020 10-K, which he personally signed. In particular, statements by former Company employees made to counsel in the Consolidated Class Action directly link Defendant Sarig to the misconduct alleged herein, particularly with respect to AIMEE. In addition, the March 2021 Proxy Statement was solicited on his behalf, which contained false and misleading statements. As the Company's highest officer and as a trusted Company director, he conducted

little, if any, oversight of the scheme to cause the Company to engage in the Flawed Marketing Practices and to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Sarig is a defendant in the Consolidated Class Action. For these reasons, Defendant Sarig breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

169.   Additional reasons that demand on Defendant Harlam is futile follow. Defendant Harlam has served as a Company director since February 2020. She also served on the Compensation Committee and the Nominating and Corporate Governance Committee during the Relevant Period. As a Company director, she receives significant compensation from the Company. In addition, Defendant Harlam signed, and thus personally made, the false and misleading statements contained in the 2020 10-K. Moreover, the March 2021 Proxy Statement was solicited on her behalf, which contained false and misleading statements. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to engage in the Flawed Marketing Practices and to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Harlam breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

170.   Additional reasons that demand on Defendant Kurtz is futile follow. Defendant Kurtz has served as a Company director since August 2019. He served as Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee and

Compensation Committee throughout the Relevant Period. As a Company director, he receives significant compensation from the Company. In addition, Defendant Kurtz signed, and thus personally made, the false and misleading statements contained in the 2020 10-K. Moreover, the March 2021 Proxy Statement was solicited on his behalf, which contained false and misleading statements. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to engage in the Flawed Marketing Practices and to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Kurtz breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

171.    Additional reasons that demand on Defendant Petersen is futile follow. Defendant Petersen has served as a Company director since September 2018. He served as Chair of the Audit Committee and as a member of the Nominating and Corporate Governance Committee throughout the Relevant Period. As a Company director, he receives significant compensation from the Company. In addition, Defendant Petersen signed, and thus personally made, the false and misleading statements contained in the 2020 10-K. Moreover, the March 2021 Proxy Statement was solicited on his behalf. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to engage in the Flawed Marketing Practices and to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Petersen breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him

is futile and, therefore, excused.

172.    Additional reasons that demand on Defendant von Walter is futile follow. Defendant von Walter has served as a Company director since September 2018. She served as Chair of the Compensation Committee and as a member of the Audit Committee throughout the Relevant Period. As a Company director, she receives significant compensation from the Company. Defendant von Walter signed, and thus personally made, the false and misleading statements contained in the 2020 10-K. Moreover, the March 2021 Proxy Statement was solicited on her behalf, and the false and misleading statements contained, which contained false and misleading statements. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to engage in the Flawed Marketing Practices and to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant von Walter breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

173.    Additional reasons that demand on the Board is futile follow.

174.    The Director-Defendants have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. In particular, three of the Director-Defendants have served together on the Board since 2018. These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, demand upon the Director-Defendants would be futile.

175.    Defendants Kurtz, Petersen, and von Walter (the "Audit Committee Defendants") served as members of the Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for, *inter alia*, overseeing the Company's accounting and financial reporting processes, reviewing Company press releases, reviewing the adequacy of the Company's disclosure controls, and reviewing and taking steps to remedy any deficiencies with the Company's system of internal controls. The Audit Committee Defendants failed to adequately oversee the Company's reporting processes, failed to adequately review Company press releases, failed to review the adequacy of the Company's disclosure controls, failed to identify or remedy deficiencies with the Company's internal controls, and failed prevent the Company from issuing false and misleading financial statements with the SEC. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

176.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Moreover, Defendant Sarig's insider sale violated the Code of Conduct. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

177.    Aterian has been and will continue to be exposed to significant losses due to the

wrongdoing complained of herein, yet the Directors-Defendants have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for Aterian any part of the damages Aterian suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

178.   The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

179.   The acts complained of herein constitute violations of fiduciary duties owed by Aterian's officers and directors, and these acts are incapable of ratification.

180.   The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Aterian. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue certain of the Director-Defendants or certain of the officers of Aterian, there would be no directors' and officers' insurance protection. Accordingly, the Director-

Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

181.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Aterian to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

182.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least three of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**

**Against the Defendants Sarig, Harlam, Kurtz, Petersen, and von Walter for Violations of Section 14(a) of the Exchange Act**

183.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

184.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

185.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no

proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

186.    Under the direction and watch of the Defendants Sarig, Harlam, Kurtz, Petersen, and von Walter, the March 2021 Proxy Statement failed to disclose, *inter alia*, that: (1) the Proposal No. 4 was not in the best interests of the Company, as the Company had overpaid for the assets of Healing Solutions, the business of which was in major part driven by sales of hand sanitizer, which had likely peaked; (2) Healing Solutions took delivery of its last hand sanitizer shipment on August 31, 2020; and (3) the acquisition of Healing Solutions was just one of a series of acquisitions the Company undertook to inflate the Company's revenues and obscure the failure of the Company's core business and the limitations of AIMEE, which was not based on AI.

187.    The March 2021 Proxy Statement also failed to disclose that: (1) AIMEE is an overhyped product with limited capabilities and customer interest; (2) AIMEE is not based on AI; (3) the Company engaged in the Flawed Marketing Practices, posing an existential risk to the Company's relationship with Amazon; (4) the Company's recent acquisitions were undertaken to obscure the failure of the Company's core business and artificially inflate its revenues; and (5) the Company failed to maintain adequate internal controls. As a result, the March 2021 Proxy Statement was materially false and misleading.

188.    In the exercise of reasonable care, Defendants Sarig, Harlam, Kurtz, Petersen, and von Walter should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the March 2021 Proxy Statement were materially false and misleading.

189.    The Company was damaged as a result of the Defendants Sarig's, Harlam's, Kurtz's, Petersen's, and von Walter's material misrepresentations and omissions in the March 2021 Proxy Statement.

190.    Plaintiff, on behalf of Aterian, has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

191.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

192.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Aterian's business and affairs.

193.    Each of the Individual Defendants violated and breached his fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

194.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Aterian.

195.    During the Relevant Period, the Individual Defendants breached their fiduciary duties to the Company by causing it to engage in the Flawed Marketing Practices.

196.    In further breach of their fiduciary duties owed to Aterian, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) AIMEE is an overhyped product with limited capabilities and customer interest; (2) AIMEE is not based on AI; (3) the Company engaged in the Flawed Marketing Practices, posing an existential

risk to the Company's relationship with Amazon; (4) the Company's recent acquisitions were undertaken to obscure the failure of the Company's core business and artificially inflate its revenues; and (5) the Company failed to maintain adequate internal controls. As a result of the foregoing, Aterian's public statements were materially false and misleading at all relevant times.

197.    The Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, while one of them conducted insider sales of Company common stock for proceeds of approximately $690,000, which renders them personally liable to the Company for breaching their fiduciary duties.

198.    Also in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

199.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Aterian's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

200.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

201.    As a direct and proximate result of the Individual Defendants' breaches of their

fiduciary obligations, Aterian has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

202.    Plaintiff on behalf of Aterian has no adequate remedy at law.

## THIRD CLAIM

### Against the Individual Defendants for Unjust Enrichment

203.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

204.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Aterian.

205.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Aterian that was tied to the performance or artificially inflated valuation of Aterian, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

206.    Plaintiff, as a shareholder and a representative of Aterian, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

207.    Plaintiff on behalf of Aterian has no adequate remedy at law.

## FOURTH CLAIM

### Against the Individual Defendants for Abuse of Control

208.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

209.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Aterian, for which they are legally responsible.

210.    As a direct and proximate result of the Individual Defendants' abuse of control, Aterian has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

211.    Plaintiff on behalf of Aterian has no adequate remedy at law.

## FIFTH CLAIM

### Against the Individual Defendants for Gross Mismanagement

212.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

213.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Aterian in a manner consistent with the operations of a publicly-held corporation.

214.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Aterian has sustained and will continue to sustain significant damages.

215.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

216.    Plaintiff on behalf of Aterian has no adequate remedy at law.

## SIXTH CLAIM

### Against the Individual Defendants for Waste of Corporate Assets

217.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

218.    The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

219.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Aterian to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

220.    As a result of the waste of corporate assets, the Individual Defendants and are each liable to the Company.

221.    Plaintiff on behalf of Aterian has no adequate remedy at law.

## SEVENTH CLAIM

### Against Defendants Sarig, Hamaide, and Rodriguez for Contribution
### Under Sections 10(b) and 21D of the Exchange Act

222.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

223.    Aterian, Defendant Sarig, Defendant Hamaide, and Defendant Rodriguez are named as defendants in the Consolidated Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Consolidated Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Sarig's, Hamaide's, and Rodriguez's willful and/or reckless violations of their obligations as officers and/or director of Aterian.

224.    Defendants Sarig, Hamaide, and Rodriguez, because of their positions of control and authority as CEO, former CFO, and current CFO of Aterian, respectively, were able to and

did, directly and/or indirectly, exercise control over the business and corporate affairs of Aterian, including the wrongful acts complained of herein and in the Consolidated Class Action.

225.    Accordingly, Defendants Sarig, Hamaide, and Rodriguez are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

226.    As such, Aterian is entitled to receive all appropriate contribution or indemnification from Defendants Sarig, Hamaide, and Rodriguez.

### **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Aterian, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Aterian;

(c)    Determining and awarding to Aterian the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Aterian and the Individual Defendants to take all necessary actions to reform and improve Aterian's corporate governance and internal procedures to comply with applicable laws and to protect Aterian and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and

the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Aterian to nominate at least three candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e) Awarding Aterian restitution from Individual Defendants, and each of them;

(f) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: October 21, 2021                Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**
*/s/ Timothy Brown*
Timothy Brown
Saadia Hashmi
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

## VERIFICATION

I,      Shaoxuan Zhang      am      a      plaintiff      in      the within      action. I have   reviewed   the   allegations   made   in   this   shareholder   derivative complaint,  know  the  contents   thereof,   and   authorize   its   filing.   To   those allegations   of which   I have  personal   knowledge,   I  believe  those  allegations  to be   true.   As to   those allegations   of which   I  do   not   have personal knowledge, I rely  upon  my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this _th day of _____, 2021.

10/20/2021

DocuSigned by:

8544D1F902D2442...

Shaoxuan Zhang